Filed 6/10/20

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E069445 |
| v. | (Super.Ct.No. FSB1304351) |
| MICHAEL DWAYNE HUGHES, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. J. David Mazurek, Judge. Reversed.

Gene D. Vorobyov, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric Swenson and Michael D. Butera, Deputy Attorneys General, for Plaintiff and Respondent.

1

Michael Dwayne Hughes hit another vehicle whose driver failed to yield to him. The three people in the car he hit died from their injuries. Hughes had been previously convicted of driving under the influence and had been drinking on the night of the accident. The prosecution charged Hughes with three counts of murder, among other charges, on the theory he knew the risk of driving while intoxicated but drove anyway.

The critical issue at trial was whether Hughes's drinking was a substantial factor in causing the accident. The police and highway patrol both concluded the deceased driver was the primary cause of the accident, and their testimony suggested Hughes's speed and drinking may have played a role, but that the physical evidence suggested he was not driving at an unsafe speed and he responded appropriately in attempting to avoid the collision.

After the jury heard that testimony, however, the prosecution called as an expert witness a second member of the highway patrol team which investigated the accident. The expert disagreed with his colleagues and offered new expert testimony—not previously disclosed to the defense in violation of the criminal discovery statutes—that the accident wouldn't have happened if Hughes had been driving at the speed limit and hadn't been intoxicated. Though defense counsel objected to this testimony in a timely fashion, the trial court allowed the prosecution to proceed with the questioning, and the defense had to cross-examine the expert without an opportunity to prepare adequately.

The trial court denied Hughes's motion for a mistrial and attempted to remedy the discovery violation by instructing the jury that the prosecution hadn't disclosed the new evidence in a timely fashion and allowing the defense to recall the expert. In the end, the expert's new testimony on causation was uncontradicted, the jury convicted Hughes of three counts of murder, and the trial court sentenced him to three consecutive 15-year-to-life terms.

We conclude the trial court abused its discretion in failing to grant Hughes a mistrial. The trial court had the opportunity to salvage the trial by continuing it and allowing the defense to locate, prepare, and seek the assistance of an expert to rebut the surprise expert causation testimony when the defense first objected. By failing to do so and allowing the prosecution to proceed in its questioning of the expert, the trial court contributed to a situation with no adequate remedy but a mistrial. We therefore reverse Hughes's convictions.

# I

# FACTS

A. *The Fatal Accident*

Around 6:50 p.m. on January 18, 2013, Michael Hughes left work in his Mercury Sable and drove south on Riverside Avenue. About the same time, a woman and two young girls—12 and 13 years old—drove a PT Cruiser in the opposite direction. Just before 7:00 p.m., the two vehicles converged near the intersection of Riverside and Placentia Avenue.

The woman began a left turn across the southbound lanes of Riverside Avenue but didn't leave enough time to cross. Hughes braked and tried to avoid the PT Cruiser but hit its right rear side. The PT Cruiser spun in a clockwise rotation, clipped Hughes's car, before tipping onto the driver's side, and stopping on the west side of the street, about 60 to 70 feet from the impact. Hughes's car crossed the northbound lanes, jumped the curb, and came to rest about 130 feet from the impact.

Bystanders tried to help by calling emergency services, flipping the PT Cruiser right-side up, and checking on the victims. Hughes survived, but all three passengers of the PT Cruiser died, two at the scene and a third later at the hospital. An autopsy revealed no drugs or alcohol in the system of the driver of the PT Cruiser.

B. *Hughes's Intoxication*

Police responded to the fatal crash and found Hughes at the scene. They noticed the smell of alcohol on his person, so a Colton police officer performed standard field sobriety tests, although it was more than an hour after the collision.

The officer who administered the tests said Hughes exhibited signs of intoxication, including a slight swaying, difficulty balancing without the use of his arms, trouble counting upwards while balancing, trouble with muscle coordination and following directions, and difficulty walking a straight line without looking at his feet. The officer concluded Hughes was under the influence of alcohol and was impaired to the point it was unsafe for him to operate a vehicle. Based on these signs of impairment, the officer arrested Hughes.

At approximately 9:03 p.m., more than two hours after the accident, a law enforcement medical services nurse drew blood from Hughes. A gas chromatograph analysis later showed Hughes's blood alcohol level two hours after the accident to be 0.13 percent, above the legal limit of 0.08 percent. The defense called a toxicologist to testify about blood testing methods and the nature of alcohol absorption. He explained alcohol levels would be expected to change in the two hours between the accident and the time the nurse took blood from Hughes. Given the time between the accident and the blood draw, he said Hughes's blood-alcohol level was probably rising throughout that period and could have been below the legal limit at the time of the crash.

Hughes worked as a security guard at Razor USA, the scooter manufacturer, located at 3996 South Riverside Avenue, about a quarter mile from the site of the accident. A manager at Razor said Hughes had worked for them for six or seven years, and he'd never had a problem with Hughes involving alcohol. He said he spoke to Hughes between 5:30 and 6:00 p.m. the night of the accident. "At the end of the day when I was prepared to leave the facility for that day . . . [h]e was performing his rounds, so I drove around the building and we spoke for 20 minutes or so." He said he was very close to Hughes and smelled no alcohol.

The day after the accident, Razor undertook an investigation. The manager said they searched the guardhouse where Hughes worked and found no alcohol. Razor maintains a camera in the guardhouse—"staring at the back of [the guard's] head"— where Hughes was required to spend most of his day. The manager reviewed surveillance

footage from the day of the accident and reported he didn't see Hughes drinking at any point and saw Hughes leave work about 6:50 p.m. On cross-examination, the manager acknowledged there were periods of the day during which Hughes was not visible on the surveillance recordings. A week after the crash, a search of Hughes's car produced two open and empty beer cans.

Hughes had previously been convicted for driving under the influence and as a part of that proceeding, he was expressly advised that if he drove drunk again and killed someone, he could face murder charges. At the scene of the accident, Hughes provided police with a state ID card, not a driver's license.

C. *The Charges and Preliminary Hearing*

On October 8, 2013, the San Bernardino District Attorney charged Hughes by felony complaint with three counts of second-degree murder (Pen. Code, § 187, subd. (a), unlabeled statutory citations refer to this code).[1] The trial court held a preliminary hearing on April 23, 2014 to determine whether the district attorney could proceed with the charges.

Two police officers with the Colton Police Department testified about the scene of the accident. As they would at trial, they said they found two cars, a Mercury Sable and a

---

[1] The district attorney also charged Hughes with three counts of gross vehicular manslaughter while intoxicated (§ 191.5, subd. (a)), committing a D.U.I. and causing injury (Veh. Code, § 23153, subd. (a)), and driving while his blood alcohol level was at or above 0.08 percent and causing injury (Veh. Code, § 23153, subd. (b)).) They also alleged enhancements of the D.U.I. counts for personally inflicting great bodily injury (§ 12022.7, subd. (a)) and proximately causing bodily injury or death (Veh. Code, § 23558). The jury failed to reach a unanimous verdict on these counts and the trial court declared a mistrial as to them. They play no part in this appeal.

6

PT Cruiser, that had been in a collision. Each had extensive damage. One officer described finding the driver of the PT Cruiser deceased in the driver's seat and a second passenger, a child, in a flowerbed outside the vehicle. She too was deceased. The officer said a third passenger in the PT Cruiser had been taken to the hospital where she later died.

The officers interviewed Hughes at the scene. Hughes said he was traveling southbound on Riverside Avenue when a vehicle turned in front of him and he collided with it. Hughes said he applied the brakes and tried to avoid the collision, but he hit the car anyway. As they would testify at trial, both officers said Hughes smelled of alcohol, though he denied to both that he had been drinking. The second officer, who had arrived on the scene around 7:55 p.m., performed field sobriety tests and called a nurse to draw blood for testing. The officer described the field sobriety tests he conducted, as well as his conclusion Hughes was under the influence of alcohol.

California Highway Patrol Officer Donald Finn testified about the accident investigation he conducted and the report he wrote as a member of the Multidisciplinary Accident Investigation Team (MAIT team), which he described as "a small unit that investigates, typically, high-profile or more complex investigations, and assists allied agencies, other police departments with their investigations." On this occasion, the Colton Police Department requested the help of the MAIT team in performing a speed reconstruction investigation.

Officer Finn recounted the MAIT team's process. "I normally begin by drawing a to-scale diagram through AutoCAD program, documenting all the physical evidence that is measured and photographed at the scene, so it's to scale, placing the Mercury and the PT Cruiser involved in this collision to scale on the diagram. Placing them at their points of impact as a reference. [¶] And, then, through an analysis of the physical evidence at the scene and the paths of travel of both the vehicles, based on the energy involved, doing energy basis reconstruction."

In this case, according to Officer Finn, "As the PT Cruiser was making a left-hand turn, Mr. Hughes was driving southbound in the No. 2 lane. He was able to see the vehicle making a left, the PT Cruiser make a left-hand turn in front of him. He was able to perceive that, react to that, apply the brakes." Finn said, "For lack of a better word, he dynamites the brakes as hard as he can. He slides into the right rear of the PT Cruiser." The PT Cruiser spun clockwise from the impact and the right front of the car hit the right rear of the Sable. After the two collisions, "The Mercury Sable veered off to the left, stopped, leaving the tire friction mark, physical evidence item No. 1, began a counterclockwise rotation and turning movement to the southeast, struck a – crossed the northbound 1 lane, crossed the northbound No. 2 lane, struck a curb, traversed the curb, went across the dirt shoulder and got caught and stopped by . . . a chain-link fence." According to Finn, the braking, skidding, collisions, spinning and other impact along the path all reduced the speed of Hughes's car. He also testified that he looked at data from

the event data recorder on the Sable, which showed the vehicle slowed by 26 miles per hour in the 78 milliseconds after the airbags deployed.

The MAIT team applied a sophisticated set of mathematical formulas to this evidence to conclude Hughes was traveling at about 63 miles per hour when he applied the brakes. Their analysis proceeded by breaking the path of the vehicle into segments and moving backward from the Sable's point of rest to the moment just before impact. As Officer Finn described it, "We added all the energy from the separate segments, adding them one to another, until we reached the impact phase, which our energy equivalent to the impact phase gave us the velocity."

The prosecutor then questioned Officer Finn about the method the MAIT team employs in conducting a speed analysis. The prosecutor's questions emphasized the scientific and exacting nature of the analysis.

Q      And there are set mathematical formulas for all of this, correct?

A      Yes, sir.

Q      You just don't pull these numbers and equations out of thin air just 'cause you think they look nice?

A      No, sir.

Q      These are actual equations that science, physics has come up with?

A      Yes, sir.

Q      And you utilized these equations and you were able to determine what the impact speed of the Mercury Sable was, utilizing these mathematical formulas?

A    Yes, sir.

Q    And what is that? [¶] . . . [¶]

A    55 miles an hour, sir.

Q    And that actually would be the speed at impact after the brakes had actually been applied by the Sable, correct?

A    Yes, sir. [¶] . . . [¶]

Q    Okay. Now, from that point backwards to when the skid marks actually started, are you able to calculate the pre-impact speed of the Mercury Sable?

A    Yes, sir.

Q    And how are you able to do that? Is this another mathematical formula and equation that you use?

A    Yes, sir, I utilized kinematic equations. [¶] . . . [¶] Energy-based equations dealing with the gravity, the friction valuation, distances, the friction value assigned to the mark on the roadway, and then the distance.

Q    And these kinematic equations that you utilize, these are also not equations that just sprang out of your head just for the sake of it, are they?

A    No, sir, they are not.

Q    These are equations that actually stem from Sir Isaac Newton and have been around for 5 or 600 years, correct?

A    Yes, sir.

Q    Now, utilizing the evidence that you had, as well as all of these variables, and you plug them into your situation, what was the pre-impact speed of the Mercury Sable at the time that the brakes were first applied?

A        63 miles an hour, sir.

Officer Finn then testified Hughes's speed exceeded the speed limit by eight miles an hour, a violation of the Vehicle Code.

The prosecutor also asked Officer Finn to describe the extensive training he received to enable him to conduct the speed analysis.

Q        And while you're not a physics major, as has been pointed out in cross-examination, I assume you're trained in the computation[s] that you use?

A        Yes, sir.

Q        What kind of training?

A        The first class, Intermediate Accident Investigation, is a 40-hour class. [¶] Then, Advanced Accident Investigation is an 80-hour class. [¶] Then math and physics is a class that's 40 hours. [¶] The Traffic Accident Reconstruction 1 is an 80-hour class. [¶] Traffic Accident Reconstruction 2 is an 80-hour class.

In all, Officer Finn received eight weeks of training.

At the end of the hearing, the trial court determined there was evidence to support the charges, and ordered Hughes held over to answer for all the offenses charged. On April 25, 2014, the district attorney filed an information with the same charges and enhancements alleged in the complaint.

11

D. *Trial Opening Statements*

Trial began on June 8, 2017. The same prosecutor who had represented the People at the preliminary hearing also represented the People at trial.

In his opening statement, the prosecutor conceded the jury would hear testimony that the driver of the PT Cruiser was at fault for the accident because she turned left in front of Hughes without leaving adequate space. However, the prosecution's theory of the case was Hughes was also responsible because his driving speed and intoxication were also causes of the accident.

In the opening statement, the prosecutor told the jury they could infer causation from the evidence of Hughes's intoxication and evidence of how intoxication affects your ability to react to dangers. "[W]hat happened . . . is that being under the influence, you're gonna hear testimony that affects your judgment. It impairs your muscle reflexes. It impairs your perception. And that the defendant's perception and judgment was in fact compromised as a result of being under the influence at .13. [¶] At this point in time the defendant applied his brakes. We know this because there is that one skid mark left from the left front tire that went approximately 65 feet heading into the collision. [¶] You're gonna hear testimony that that should have been done earlier. Based on the line of sight, based on the unobstructed view, the expert testimony is gonna say that his impairment did not allow for the proper reaction time."

The prosecution's theory of implied malice was that Hughes was subjectively aware of the dangers of drunk driving because he had suffered a prior DUI conviction

12

and was warned that if he drove drunk again and killed someone, he could be charged with murder. The prosecutor said Hughes acted with conscious disregard of that risk by drinking to a point of intoxication, getting behind the wheel of a car, and speeding.

The defense theory of the case, as presented in their opening statement, was Hughes was not traveling at an unsafe speed, his perception and reaction time was not significantly affected, and neither Hughes's speed nor his intoxication were substantial causal factors in the accident. They pointed out the investigating police and the accident reconstruction team both reached those conclusions. "And what did they say? What did they conclude? They concluded Mr. Hughes was not traveling at an unsafe speed. Mr. Hughes tried to avoid impact. Mr. Hughes reacted in excess of a hundred feet and there were the preimpact skid marks . . . They concluded that his reaction time, his perception time was not significantly impaired. [¶] And then they concluded that alcohol was not a factor."

The defense also pointed out the evidence shows Hughes consumed alcohol only minutes before the accident and that police didn't test his impairment until long after the accident, making it likely he was not impaired when the accident occurred, and certainly not to the degree he was impaired when the police drew his blood two hours later.

E. *Trial Evidence*

1. *Investigation by the Colton Police Department*

The Colton Police Department investigated Hughes's accident and produced a traffic collision report, which included a diagram and photographs identifying the

location of all pieces of evidence investigators believed were related to the collision. The report concluded the driver of the PT Cruiser caused the accident by failing to yield the right of way to oncoming traffic and listed her error as the "primary collision factor."

The report identified Hughes's driving under the influence as an "associated factor." The officer who prepared the report explained the "[p]rimary factor is the reason that that collision occurred. An associative [*sic*] factor is something that may have contributed to the actual collision." He said "alcohol may have been a factor, but that can't be determined conclusively." However, the officer said the later reconstructions, speed calculations, and blood toxicology results led him to believe intoxication did play a part in causing the collision. The Colton Police Department also concluded there were no signs of reaction time or perception being significantly impaired.

### 2. *The MAIT investigation and report*

On January 24, 2013, the officer who prepared the report had an hour-long meeting with the California Highway Patrol's MAIT team, which was led by Sergeant Lance Berns. At the meeting, the Colton Police Department provided their report and diagram for the purpose of assisting the team with the accident reconstruction portion of the investigation. During this meeting, Berns commented that he believed Hughes wasn't traveling at an unsafe speed and alcohol wasn't a factor in the accident. Following the meeting, the MAIT team launched an investigation into the collision.

A MAIT team mechanic inspected both vehicles to determine whether the condition of either car contributed to the crash. The mechanic discovered Hughes's rear

14

antilock brake system wasn't operating because its sensors were blocked. However, because an antilock system is not required for a vehicle's brakes to function in a safe and lawful manner, the team concluded the deficiency didn't contribute to the collision and that no mechanical deficiencies or failures in the critical control system of either vehicle contributed to the collision.

The MAIT team also undertook an independent accident reconstruction analysis. Officer Finn, who wrote the MAIT report, testified about the analysis at trial, as he did at the preliminary hearing. He said team members reviewed the evidence and materials provided by the Colton Police Department and visited the accident site. They concluded the diagram in the police report had mistakenly attributed two friction marks in the road and marks on the curb to the vehicles involved in this collision and omitted friction marks that should have been attributed to Hughes's car. Based on their inspection, the MAIT team prepared their own accident diagram. Like the police report, the MAIT team concluded the crash occurred when Hughes struck the rear passenger side portion of the victim's PT Cruiser as it was making a left turn. The MAIT team also concluded Hughes applied his brakes 49 feet before impact but was still traveling at approximately 55 miles per hour when he struck the PT Cruiser.

The MAIT team also performed calculations to determine the speeds of both vehicles before they applied their brakes and before they collided. They broke the speed calculation for Hughes's vehicle into five separate segments, worked back in time from the point of rest, and determined what speed would account for the path of the car at each

15

point. The event data recorder in Hughes's car showed a rapid deceleration of 26 miles per hour in 78 milliseconds on impact. The recorder is triggered when an airbag deploys and records the vehicle's change in velocity over a short period of time. The MAIT team relied on this data in determining the car's speed at impact. However, the MAIT report noted Hughes's recording device is an older model that records a shorter period than newer units that record data for up to 150 milliseconds.

Based on these calculations, the MAIT report found Hughes's vehicle was traveling at least 63.4 miles per hour just before he applied the brakes. The speed limit is 55 miles per hour on Riverside Avenue near the site of the accident. The report also concluded the MAIT team's findings were consistent with the Colton Police Department's investigation report finding the victim's failure to yield the right of way when making her left turn was the primary cause of the accident.

The MAIT report's scope did not include evaluating Hughes's impairment or the Colton Police Department's conclusion that Hughes's alcohol use was an associated factor. However, Officer Finn testified he believed Hughes was not travelling at an unsafe speed and his speed was not a contributing factor to the collision. He also said, based on the point where Hughes began reacting and the evasive measures he took, he did not believe Hughes's reaction time or perception had been significantly impaired. Finn's testimony tended to undermine the prosecution's case that Hughes's speed and intoxication were substantial factors in causing the accident, required to establish second-degree murder charges.

### 3. *Surprise testimony by the MAIT team leader*

On the heels of Officer Finn's testimony, the People called the leader of the MAIT team, California Highway Patrol Sergeant Lance Berns. His testimony departed substantially from the MAIT report he had endorsed as the team leader and also differed from the testimony of Officer Finn on the critical causation issue. According to Berns, he continued to "look into the case" even after the MAIT report was finished. He said he continued to do research and go over the equations in the case as early as a few months before trial and had produced a new traffic accident diagram the day before his testimony. He also said he produced notes in the process of undertaking this analysis and coming to the conclusions represented in his diagrams and said the prosecutor was aware he had notes.

Despite this change in approach, neither Sergeant Berns nor the prosecutor disclosed the new evidence to the defense until Berns was in the witness chair at trial under the prosecutor's direct examination. They didn't produce the notes showing Berns's new calculations or the diagrams Berns created the day before trial to illustrate his new conclusion. Instead, the prosecutor marked the diagrams for admission and proceeded to elicit Berns's new conclusions in front of the jury. The existence of the notes became apparent only when Berns asked to see them to refresh his recollection about the new speed calculations he had made. As it happened, his surprise testimony concerned whether Hughes's speed and intoxication were substantial factors in causing the accident that killed the three victims. The prosecutor later reported he had learned of

17

the new diagrams only three hours before Berns took the stand and later claimed his failure to tell defendant and defense counsel of the new documents immediately upon becoming aware of the new evidence was an oversight on his part due to his being focused on the trial and questioning Officer Finn in particular, a major witness.

We now turn to the content of Sergeant Berns's new testimony. On Hughes's speed, Berns said he had concluded Hughes was traveling at a higher speed than the MAIT report concluded. He emphasized the MAIT report was designed to determine only a vehicle's minimum speed. But he also provided new reasons for thinking the report had underreported that speed. First, he pointed out the older event data recorder in Hughes's car recorded data for only 78 milliseconds, whereas newer recorders capture data for a longer period. Berns said the older recorder underreported the decrease in Hughes's speed caused by the collision "probably between 3 and 4 miles per hour." He said he came to that figure by using the trajectory of the speed loss graph provided by the event data recorder and by consulting with someone who teaches analysis and downloads for event data recorders. Based on that analysis, he concluded Hughes's speed just before he applied the brakes was about 67 miles per hour and the impact speed about 59 miles per hour.

Sergeant Berns also testified he had concluded Hughes would not have collided with the victim had he been sober and traveling at the speed limit. This constituted testimony on a topic no one had previously broached. To illustrate Berns's new speed analysis, the prosecutor introduced a diagram Berns had prepared the day before. It

compared the position of Hughes's vehicle traveling 67 miles per hour with his position if he had been traveling the speed limit of 55 miles per hour. Berns described the illustration as "a time position diagram that I prepared yesterday with regards to vehicle speed comparison between 67 miles per hour and 55 miles per hour." The prosecutor then asked, "Now, the car that's going 67 miles an hour, did you assume that the defendant, in drawing this particular diagram, was in fact sober and perceiving as a normal, sober individual?"

At that point, defense counsel objected "only because this is the first time we've seen this diagram." The trial court acknowledged the problem and halted proceedings briefly. When the jury had left the courtroom, the prosecutor produced a second diagram he'd not previously disclosed to defense counsel. The trial court directed defense counsel to "take a couple minutes" to review the diagrams and ask questions of Sergeant Berns about them off the record. Defense counsel objected that the production of documents was untimely. "The witness has said that he's been reviewing this case for months. And if he just provided a diagram today and [they] expect that to get admitted, I think [that is] an untimely piece of evidence."

The prosecutor responded, "I'm allowed to come up with diagrams any point in time." The trial court agreed, "Here's the problem: He could draw it now for us. He could draw the same thing and use a piece of paper and draw the same thing. That's why I'm giving you the opportunity to talk to him about it at this point in time." Defense counsel then asked for a copy of Berns's notes to review. The trial court agreed they could get a

19

copy during a later break.

The trial court then recalled the jury and the prosecutor resumed questioning Sergeant Berns. He again displayed the new diagram and asked Berns to tell the jury what it depicts. Berns said it's "a comparison between the Mercury traveling 67 miles per hour versus 55 miles an hour with the beginning of a perception response location." He said, "this first vehicle here is the beginning of perception response time based on the location of the beginning of [the] tire friction mark. And what I did is I multiply 67 miles per hour times the conversion factor of 1.467 to convert into feet per second. And then I multiply that by 1.5 seconds, which is the standard response time, and it places the vehicle here. [¶] The second vehicle here is—had [Hughes] . . . been traveling 55 miles per hour with P and R being the same—'cause that's where he recognized the hazard—he would have began braking here versus here. Now you can see that the braking distance at 55 would have been a little over 75 feet versus 67, which was just under 49 feet. [¶] Well, all that takes time. So here—at 67 miles per hour he would have been braking for 1.1 second. Now you subtract that from the .53 seconds; you get a difference of .057 seconds." Berns then said his new calculations showed Hughes's speed was a cause of the crash because he would not have collided with the PT Cruiser had he been sober and traveling the speed limit. Sergeant Berns also concluded the accident wouldn't have been as serious if Hughes had been sober and driving at 63.4 miles per hour as the MAIT report concluded. He depicted those calculations in the second new diagram.

Though Sergeant Berns conceded he didn't evaluate Hughes, he said Hughes's

reduced perception and reaction times due to intoxication were a contributing cause of the collision, whether he was traveling at 67 miles per hour or 63.4 miles per hour. He based this conclusion, in part, on National Highway Traffic Safety Administration studies showing an average person's reaction time is 1.5 seconds and a person who is intoxicated with a blood alcohol above 0.08 percent experiences a 15-25 percent increase in response time. Relying on these premises, Berns concluded the delay in reaction time caused by Hughes's intoxication was a determinative factor in the collision.

Defense counsel cross-examined Sergeant Berns without a break after his direct testimony. The defense pressed Berns on the seeming impropriety of changing his opinion or offering new opinions and disagreeing with his MAIT team colleagues. Berns acknowledged he signed off on the original report and didn't solicit input on his new analysis from any of those team members. They questioned Berns as to why he didn't provide the information and diagrams to defense counsel sooner. He responded that he hadn't created the diagrams until the day before his testimony, but acknowledged he had been working on the notes for a week before trial and that the prosecutor knew he had notes. However, the defense made no effort to challenge the speed analysis underlying Berns's new opinion that Hughes's speed and intoxication caused the collision.

4. *Motion for a mistrial*

The next day of trial, the prosecution presented two more witnesses, and then defense counsel moved for a mistrial.

They argued Sergeant Berns "provided information to the People in the morning

21

before the lunch break . . . . The People did not provide that information to the defense until the time that the witness testified after the lunch break. Defense believes that that would constitute untimely discovery. [¶] The issue is that the witness did change his opinions and/or conclusions regarding speed from what is written into the report to what I believe he said was a margin of error that he believed is more likely that the speed was about 5 miles an hour higher. And that was the first time defense counsel had heard that information. [¶] Had we known, the defense would have liked to have prepared and conduct[ed] additional discovery to verify a few things. Based on the untimeliness of that information, we would ask for a mistrial."

Defense counsel also pointed out, "In addition to Mr. Berns testifying to a different speed, he also changed his conclusions as to whether or not the defendant was an associated cause. So his original conclusions very clearly articulated that defendant was not a contributing factor—contributing cause in this accident; that speed was not a factor; alcohol was not a factor and that he had actually had good reaction time—the defendant. So Mr. Berns also changed his conclusions from that January 24th, 2013 conclusions on the stand prior to his testimony."

The trial court acknowledged the problem. "[T]he way the Court views it is Sergeant Berns did provide information that was substantially different than what was in the MAIT report or what counsel could have expected Sergeant Berns to testify about based on all of the discovery previously exchanged and forthcoming in the case. And Sergeant Berns's testimony about alcohol and speed being associated, related, whatever

22

words you wanna use, it does go to the crux of the issue in the case, and that's whether Mr. Hughes's driving under the influence was a cause of the collision, or the traffic accident. [¶] So I understand that that information is substantially different and counsel could have relied on the discovery previously provided."

The trial court did not, however, focus on whether the prosecution should have turned over Sergeant Berns's notes, which would have alerted defendant to the substance of the new testimony and allowed time for defense counsel to prepare to address it. Nor did the trial court consider the effect on the defense case of allowing that testimony in unchallenged, rather than taking a break in the trial to allow defense counsel to prepare, seek additional discovery, and enlist additional expert assistance with the new speed and collision analysis. Instead, the trial court focused on whether the prosecutor had engaged in gamesmanship by withholding Berns's two diagrams for three hours and springing them on the defense with Berns on the stand. "[T]he issue is whether or not the prosecution had that information prior to Sergeant Berns taking the stand or not. [¶] I have [the prosecutor's] statement as an officer of the court that he didn't have that information until the morning of the testimony. I also have Sergeant Berns's sworn testimony under oath that he didn't provide that information and didn't come to those conclusions nor prepare the diagram until the day before. [¶] So is there any evidence that the defense can point to that would give the Court reason to believe that the information provided by Sergeant Berns and [the prosecutor] was incorrect? Is there any evidence that

you have that the information was actually provided at a time before indicated by those two folks?"

The prosecutor then focused the issue more directly on disclosure of the diagrams and the question of prosecutorial misconduct, rather than late discovery. "The fact is if the Court believes that the delay of a couple three hours in me turning over the information was in fact late discovery, the fact is I did get it late. I got it that morning." He then excused his failure to disclose the diagram on the fact that he was in the middle of trial and in the middle of a major witness, Officer Finn.

Defense counsel argued the failure to disclose the information "can be construed as prosecutorial misconduct and grounds for dismissal." Defense counsel asked for a hearing on the issue.

The next day, June 27, 2017, the court held a hearing related to the mistrial motion and the issue of late discovery and prosecutorial misconduct. The prosecutor was represented by counsel. The court summarized the issues for the prosecutor's counsel and said the issue concerned the failure to disclose both the diagrams and the notes, which would have alerted defense counsel to the substance of Sergeant Berns's new testimony. The court said the focus would be on the "new opinions and conclusions that were reached that are contrary to any other opinions and conclusions that were previously reached by anybody in this case that then are also now helpful to the prosecution on the issue of causation and were not disclosed to the defense prior to the witness taking the stand."

24

The prosecutor's counsel then questioned the relevance of the notes because "there's no indication that he knew of any of those notes prior to Sergeant Berns describing them while he was on the stand." The court agreed with that characterization, and much of the rest of the discussion assumed the problem was the prosecutor's failure to disclose the diagrams in the few hours between the prosecutor becoming aware of them and Berns's testimony. As we've noted above, Berns's testimony was to the contrary, that he had been working on the issue for a few months and that the prosecutor knew he had notes reflecting his new calculations.

In the end, the court found the prosecutor did not commit prosecutorial misconduct but did commit a discovery violation by failing to provide the diagrams and Sergeant Berns's conclusions to defense counsel before Berns took the stand.

However, the court declined to order a mistrial on the ground that other remedies would be sufficient to address the problem. "A mistrial and a dismissal is the most severe penalty that the Court can impose. And I can only do that if I'm satisfied that other sanctions or remedies short of that would be effective or would not be effective. And in this case I think there are other remedies short of imposing a mistrial and dismissal that would be effective." The court said it would give a jury instruction on late discovery and noted Sergeant Berns was subject to recall. "If you need more time to consult with your expert before you call Sergeant Berns back or there's other additional things that you need to do in preparation for that . . . you let me know what else we might need to do. I will make sure that we get that done. But at this point the Court, based on everything that

25

it's heard and seen and experienced, thinks that it was sort of prosecutorial error, not egregious misconduct. And it's a discovery violation, but the remedy is something short of mistrial and dismissal."

The defense then proceeded with its case.

5. *The Defense accident reconstruction expert*

The day after the ruling on the motion for mistrial, the defense called Dale Stephens, a former MAIT team member, to testify in Hughes's defense as an accident reconstruction expert.

Stephens said he believed, based on his review of the Colton Police Department report and MAIT report, that the driver of the PT Cruiser, not Hughes, was at fault for the collision. He also testified Hughes's speed was not unsafe, and his impairment did not contribute to the crash. "[T]he PT Cruiser is looking ahead and the headlights [of Hughes's car] are 190 feet away based upon the CHP skid analysis or calculations. That vehicle is – it's – I'm trying to figure out the yardage. It's a little over 60 yards. So a vehicle that's 60 yards away in a 55-mile-an-hour zone that's approaching you, do you turn left in front of that vehicle? No. The vehicle is an immediate hazard. You have to wait." However, he acknowledged alcohol consumption and blood alcohol levels above 0.08 percent can impair a driver's ability to track objects, recognize danger, and react to changing conditions.

Regarding Hughes's speed before the crash, the defense reconstruction expert disagreed with the friction value used in step 3 of the MAIT report's speed calculation.

The report used an improperly high friction coefficient to calculate speed, and therefore overestimated Hughes's speed by several miles per hour. Stephens said, using the correct friction coefficient, he calculated Hughes's minimum speed as 58 miles an hour. He conceded his opinion reported a minimum speed and Hughes's actual speed was likely somewhat higher. Nevertheless, he agreed that Hughes was not a contributing cause to the accident.

The defense reconstruction expert also reviewed and criticized Sergeant Berns's new opinion that Hughes had been traveling approximately 67 miles per hour and that his speed and intoxication were contributing causes of the accident. First, he said preparing additional speed calculations in isolation deviated from standard MAIT protocol, which normally consists of running all conclusions by the team to ensure their accuracy. "Whoever is writing the report will come up with a conclusion, but his – his or her report will be forwarded to the other members of the [team], and they'll go through it and determine if – if what the officer has done is correct. Of if there are problems, and then the officer will go back and fix them." Stephens said that was true of every one of the approximately 200 MAIT reports he had worked on. In his eight years on the MAIT team, he never saw an analysis go out without review by the entire MAIT team. The purpose of putting the analysis through the whole team is to avoid mistakes. "You'd rather be confronted in MAIT rather than on the stand and during trial with a mistake."

Second, he said it was unscientific and unsupported to add three to four miles per hour to Hughes's speed based on speculation about what additional data from the event

data recorder might have shown if it had recorded data over a longer period. "The sergeant states that this is only 78 milliseconds that the report usually is 100 to 150 milliseconds and therefore it should show more. The fact that he just puts 3 to 4 miles an hour into this equation, it's not scientific. It's not MAIT. It's – I don't know what it is. But MAIT – if you wanted to add miles an hour, if you wanted to figure out if you were supposed to add miles an hour, you would have to do several calculations. But when you originally look at the download of the Mercury and you – that's how you would determine – if you needed to possibly determine if you would [need] to add miles per hour. But just to say maybe 3 or 4, maybe, and then do it, that's not MAIT. It's not reconstruction." According to Stephens, the graph from the recorder showed velocity leveling off and the accelerometer approaching zero. He concluded Sergeant Berns did not do calculations to support adding three or four miles an hour to Hughes's speed, but pulled the number from thin air.

Defense didn't ask Stephens to address Sergeant Berns's new calculations and conclusions that Hughes's speed and intoxication were causes of the accident.

F. *Jury Instructions and Closing Argument*

The trial court instructed the jury using the standard instruction for charges of murder. "The defendant is charged in Count 1, 2, and 3 with murder in violation of Penal Code Section 187. [¶] To prove that the defendant is guilty of this crime, the People must prove that . . . [¶] . . . The defendant committed an act that *caused the death of another person*." (Italics added.) The court instructed, "There may be more than one cause of

28

death. *An act causes death only if it is a substantial factor in causing the death*, and the death would not have happened without the act. A substantial factor is more than a trivial or remote factor. It must actually contribute to the death. However, it does not need to be the only factor that causes the death." (Italics added.)

The court also instructed the jury that "The failure of [the victim] or another person to use reasonable care may have contributed to the death. But if the defendant's act was a substantial factor in causing the death, then the defendant is legally responsible for the death even though [the victim] or another person may have failed to use reasonable care. [¶] If you have a reasonable doubt whether the defendant's act caused the death, you must find him not guilty."

The prosecutor leaned heavily on Sergeant Berns's surprise testimony to establish the causation element, which he characterized as the single most important issue. "Now, this case actually comes down very simply to one question and one question only: The expert testimony was that a person driving 55 miles an hour and going – and not being intoxicated would have missed this collision, and there's no evidence to the contrary. Sergeant Berns went over the calculations with you as to how he arrived at that conclusion . . . . [¶] So here's the question: Since we know that a sober person driving the speed limit would have missed this collision, when you have someone who is a .13, which is 50 percent over the legal limit and they are speeding, is that now a substantial factor in the collision? If you answer that question, no, it's not, then bless your hearts –

the defendant is not guilty. On the other hand, if you say, yes, it is, then the defendant is guilty. [¶] And that's what this entire case comes down to."

G. *The Verdict and Sentence*

The jury found Hughes guilty of three counts of second degree murder. The court later denied Hughes's motion for a new trial and sentenced him to three consecutive indeterminate terms of 15 years to life.

Hughes timely filed a notice of appeal.

## II

## ANALYSIS

Hughes argues the trial court improperly denied his motion for a mistrial on the basis of the prosecutor's failure to disclose information and materials related to Sergeant Berns's expert opinion that Hughes's intoxication and speed were substantial factors in causing the fatal collision. He argues the trial court's refusal was error and violated his due process right to a fair trial.[2]

Section 1054 et seq. governs discovery in criminal cases and aims at flushing out the truth early and avoiding the element of surprise (on both sides) in criminal trials. "'The purpose of section 1054 et seq. is to promote ascertainment of truth by liberal discovery rules which allow parties to obtain information in order to prepare their cases and reduce the chance of surprise at trial. [Citation.] Reciprocal discovery is intended to

---

[2] Hughes also asks that we vacate the trial court's order denying a new trial and remand for a new hearing in the trial court. We need not address that issue because we conclude the trial court should have granted a mistrial.

30

protect the public interest in a full and truthful disclosure of critical facts, to promote the People's interest in preventing a last minute defense, and to reduce the risk of judgments based on incomplete testimony.'" (*Thompson v. Superior Court* (1997) 53 Cal.App.4th 480, 487 (*Thompson*).)

To further these ends, prosecutors are required to disclose to the defendant a long list of "materials and information, if it is in the possession of the prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies," a list which includes "[r]elevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial, *including any reports or statements of experts made in conjunction with the case*, including the results of physical or mental examinations, scientific tests, experiments, or comparisons which the prosecutor intends to offer in evidence at the trial." (§ 1054.1, subd. (f), italics added.)

This requirement is broad enough to encompass Sergeant Berns's notes, which contained the calculations that served as the basis for his new testimony and diagrams on the critical causation issue at trial.[3] In *Thompson*, the Second District, Division 1

_____

[3] The People argue Hughes forfeited the issue of the prosecution's failing to disclose notes and the contents of the new expert opinions by framing the issue as being about the disclosure of diagrams produced to the prosecution three hours before the expert testified. We disagree with that characterization. The trial court evidently understood Hughes as objecting to the failure to produce both the notes, new opinions, and diagrams. In ruling, the court said its focus would be on the "new opinions and conclusions that were reached that are contrary to any other opinions and conclusions that were previously reached by anybody in this case that then are also now helpful to the prosecution on the issue of causation and were not disclosed to the defense prior to the witness taking the stand." We conclude Hughes raised and the trial court ruled on all bases for objecting to the prosecution's surprise expert testimony. To the extent the

*[footnote continued on next page]*

31

considered whether the statutory requirement to disclose "written or recorded statements of witnesses" (*Thompson*, *supra*, 53 Cal.App.4th at p. 484, fn. 2) encompasses "raw written notes of [a] witness interview." (*Id*. at p. 485.). The court held the plain language and the purpose of the statutory discovery scheme required such notes to be turned over, "regardless of whether they later are used to prepare a report of the statement." (*Id*. at p. 486.) A "witness's words, whether recorded electronically or by someone writing them down, *are* the statement. Whether left in that form, or rearranged, restated, or edited by someone else, the witness's words in the raw written notes or unedited tape remain a statement." (*Ibid.*) And while *Thompson* involved a criminal defendant's obligation to produce notes from witness interviews, section 1054.1 imposes the identical obligation on prosecutors. (§ 1054.1, subd. (f); *Thompson*, at p. 485 ["raw written notes of witness interviews, other than attorney work product, are 'statements' as defined in section 1054.3, subdivision (a), and 1054.1, subdivision (f), and thus must be disclosed by both sides"].)

The fact that this case involves an accident reconstruction expert's technical notes only heightens the importance of early disclosure. "'[T]he need for pretrial discovery is greater with respect to expert witnesses than it is in the case of ordinary fact witnesses. If a party is going to present the testimony of experts during trial, the other parties must prepare to cope with the testimony to be given by people with specialized knowledge in a

---

proceedings below focused on Sergeant Berns's diagrams, that was attributable to the prosecution's efforts to frame the issue. Hughes did not forfeit the merits of his appeal.

32

scientific or technical field.'" (*Zellerino v. Brown* (1991) 235 Cal.App.3d 1097, 1117.)

In *People v. Lamb* (2006) 136 Cal.App.4th 575, the Third District Court of Appeal held expressly that the obligation to produce "any reports or statements of experts made in connection with the case" encompasses an expert's notes about the causes of an automobile accident. The defendant sought to avoid production on the ground "that it is only written reports of an expert that must be disclosed to the prosecution." (*Id.* at p. 580.) The defendant in *Lamb* argued "that because no . . . report was prepared, and because there is no requirement that counsel obtain a written statement from a witness [citation], there was no discovery violation. He also assert[ed] that [the expert's] notes reflected only interim conclusions, not final opinions, and therefore were not discoverable." (*Ibid.*) The court rejected this interpretation. They noted the expert "made notes about the interviews with witnesses, had made calculations to determine the cause of the accident, had made notes about his inspections of the vehicles, and had conveyed this information to defense counsel." (*Ibid.*) Disclosure of such information is required under the statutory scheme, and the gamesmanship involved in withholding it exemplifies a serious discovery violation. (*Ibid.*)

Interpreting the statutes differently would allow the outcome of criminal trials to be decided by which side was better at gaming the system, a repugnant result. Either the prosecution or the defendant could consult an expert but avoid disclosing the substance of their testimony by simply declining to request a formal written report. That solution is inconsistent with both the statutory language and its purpose. For that reason, courts

routinely require disclosure of even oral statements made to counsel. (*Roland v. Superior Court* (2004) 124 Cal.App.4th 154, 167 ["excluding [oral] statements [to counsel] from the disclosure requirement of section 1054.3—and concomitantly section 1054.1—would undermine the voters' intent because it would permit defense attorneys and prosecutors to avoid disclosing relevant information by simply conducting their own interviews of critical witnesses, instead of using investigators to perform this task, and by not writing down or recording any of those witnesses' statements"].) We therefore conclude section 1054.1, subdivision (f) required the prosecution to disclose to the defense the substance of Sergeant Berns's testimony, including his notes, as soon as they were aware of them. The failure to disclose this information until Berns was on the witness stand in front of the jury was an error of great magnitude.

And while the People attempt to minimize the error by focusing on the approximately three-hour delay in informing defense counsel about Sergeant Berns's new diagrams, the error was more serious. First, Berns himself testified he had been working on the case for a few months, testified he took notes (as he would have to do performing the kind of analysis at issue), and—critically—that the prosecutor knew he had notes.[4]

---

[4] The trial court accepted the attorney's representation that the prosecutor did not know Berns had notes reflecting his new opinions. If that acceptance constituted a finding of the trial court, it was not based on substantial evidence. The only evidence on the issue is Berns's uncontradicted testimony that the prosecutor knew of his notes. Though the trial court held a hearing on prosecutorial misconduct, the prosecutor did not testify. In our view, it's difficult to understand why the prosecutor would have called Berns to testify after calling Officer Finn if he didn't know about Berns's new opinions. We don't reach the issue of prosecutorial misconduct, however, because Hughes has not appealed that aspect of the trial court's ruling.

Add to that the fact that Berns provided the prosecutor with diagrams illustrating his new opinion that Hughes's speed and intoxication were but-for causes of the accident, and it is clear that the prosecutor knew precisely what Berns would say on the witness stand about an issue he would characterize to the jury as the most important issue presented in the case. In his own words: "Now, *this case actually comes down very simply to one question and one question only*: The expert testimony was that a person driving 55 miles an hour and going – and not being intoxicated would have missed this collision, and there's no evidence to the contrary. Sergeant Berns went over the calculations with you as to how he arrived at that conclusion." It is difficult to overstate the seriousness of holding back required discovery information that goes to the very heart of the prosecution's own theory of guilt.

The prosecutor put the trial court in a difficult position. When the court became aware of this issue, it could have acted to fix the problem and save the trial. But it didn't. Defense counsel raised the issue after Berns had testified that he believed the MAIT team underreported Hughes's speed by about four miles per hour, but immediately before he testified on causation. The prosecutor introduced one of Berns's new diagrams comparing the position of Hughes's vehicle traveling 67 miles per hour with his position if he had been traveling the speed limit of 55 miles per hour. The prosecutor asked, "Now, the car that's going 67 miles an hour, did you assume that the defendant, in drawing this particular diagram, was in fact sober and perceiving as a normal, sober individual?" Defense counsel objected and the trial court excused the jury.

35

At that point, the trial court had some options. When a party fails to comply with the statutory disclosure requirements, the trial court "may make any order necessary" to enforce those provisions, including, but not limited to, "[initiating] contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continu[ing] the matter, or any other lawful order." (§ 1054.5, subd. (b); *People v. Ayala* (2000) 23 Cal.4th 225, 299 (*Ayala*) ["'[A] trial court may, in the exercise of its discretion, "consider a wide range of sanctions" in response to [a] violation of a discovery order'"].) In this case, given the technical nature of the testimony and the fact that it concerned what all parties rightly consider *the* critical factual issue concerning Hughes's guilt or innocence on murder charges, the court should have continued the trial immediately and allowed defense counsel to do what it indicated later it wanted to do—find and consult with an expert capable of responding to Sergeant Berns's new testimony and calculations. That remedy was not an easy one to choose. Doing so would have imposed hardship on everyone in the case. It would have required a substantial amount of additional work from defense counsel and the prosecution and would have delayed the trial and inconvenienced the jury for days or potentially even weeks. And while those concerns are significant, they are less significant than a defendant's due process right to a fair trial or the public's interest in having issues of guilt and innocence determined based on facts, not litigation gamesmanship. (See *Thompson*, *supra*, 53 Cal.App.4th at p. 487.)

Unfortunately, the trial court instead allowed the trial to continue uninterrupted. At the critical point, the trial court's solution was to advise defense counsel to "take a couple

minutes" to review the new diagrams and ask questions of Sergeant Berns about them off the record. Defense counsel rightly objected, pointing out "[t]he witness has said that he's been reviewing this case for months. And if he just provided a diagram today and [they] expect that to get admitted, I think [that is] an untimely piece of evidence." The objection was to no avail, and the trial court allowed the jury to return almost immediately to hear the remainder of Berns's new testimony.

What happened next was devastating for Hughes's defense. The jury returned to the courtroom, Berns returned to the witness stand, and the prosecutor asked Berns to tell the jury what his diagram shows. Berns said the diagram depicted his speed analysis—his new calculations—and then explained that Hughes's speed was a cause of the crash because he would not have collided with the PT Cruiser had he been sober and traveling the speed limit. He then said the accident wouldn't have been as serious if Hughes had been sober and driving at even 63.4 miles per hour as the MAIT report concluded. In his closing arguments, this is the testimony the prosecutor would point to as the most critical in the case.

Defense counsel cross-examined Sergeant Berns without a break after his direct testimony. They pressed Berns on the seeming impropriety of changing his opinion or offering new opinions and disagreeing with his MAIT team colleagues and asked him why he hadn't provided the information sooner. Not surprisingly, given its technical nature, they made no effort to challenge the correctness of the speed analysis underlying his new opinion that Hughes's speed and intoxication caused the collision.

The next day of trial, defense counsel moved for a mistrial. They argued Sergeant Berns had fundamentally changed the prosecution's theory of the case and "the defense would have liked to have prepared and conduct[ed] additional discovery" to enable them to test his opinions. The trial court rightly acknowledged the problem and that the new testimony "does go to the crux of the issue in the case, and that's whether Mr. Hughes's driving under the influence was a cause of the collision, or the traffic accident." In the end, the court found the prosecutor did not commit prosecutorial misconduct but did commit a discovery violation by failing to provide the diagrams and Sergeant Berns's conclusions to defense counsel before Berns took the stand.

However, the court declined to order a mistrial because it concluded other remedies would be sufficient to address the problem. "A mistrial and a dismissal is the most severe penalty that the Court can impose. And I can only do that if I'm satisfied that other sanctions or remedies short of that would be effective or would not be effective. And in this case I think there are other remedies short of imposing a mistrial and dismissal that would be effective." The court said it would give a jury instruction on late discovery and noted Sergeant Berns was subject to recall. "If you need more time to consult with your expert before you call Sergeant Berns back or there's other additional things that you need to do in preparation for that, . . . you let me know what else we might need to do. I will make sure that we get that done. But at this point the Court, based on everything that it's heard and seen and experienced, thinks that it was sort of

prosecutorial error, not egregious misconduct. And it's a discovery violation, but the remedy is something short of mistrial and dismissal."

Appellate courts generally leave discovery matters to the discretion of the trial courts. (*People* v. *Lopez* (1963) 60 Cal.2d 223, 246-247.) To set aside a trial court's discovery decision, an appellate court must find an abuse of discretion. (*People* v. *Moya* (1986) 184 Cal.App.3d 1307, 1312.) A reviewing court may not substitute its judgment for that of the trial judge, and discretion is abused only if the trial court's ruling exceeds the bounds of reason, all of the circumstances being considered. (*People v. Giminez* (1975) 14 Cal.3d 68, 72.) This deference extends to a trial court's denial of a motion for a mistrial based on the prosecutor's violation of the discovery statutes. (*Ayala*, *supra*, 23 Cal.4th at p. 282.) "A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." (*People v. Haskett* (1982) 30 Cal.3d 841, 854; see also *Ayala*, at p. 283 [a mistrial should only be granted when "a party's chances of receiving a fair trial have been irreparably damaged"].)

We think this is a rare case in which the trial court abused its discretion by declining to declare a mistrial. Whether the prosecutor acted intentionally or not, the effect was the same: the prosecution surprised defense counsel with new technical evidence on the most critical factual question relating to Hughes's guilt on three murder charges. The prosecution relied at the preliminary hearing on evidence of Hughes's

39

intoxication, his prior conviction, and the jury's ability to infer that his intoxication caused the accident to establish probable cause that Hughes committed murder. At trial, however, the testimony of law enforcement, both first responders and the MAIT team, on the question whether Hughes's intoxication was a substantial factor causing the accident, was decidedly weak.

The officer who prepared the police report on the accident said the victim's failure to yield to Hughes was the primary cause of the accident. He said "alcohol may have been a factor, but that can't be determined conclusively." Though he said the later reconstructions, speed calculations, and blood toxicology results led him to believe intoxication played a part in causing the collision, the police concluded there were no signs of reaction time or perception being significantly impaired.

Officer Finn, who wrote the MAIT Report, testified that he didn't think Hughes's intoxication caused the accident. He said the MAIT team's findings were consistent with the police investigation report finding the victim's failure to yield the right of way when making her left turn was the primary cause of the accident. Finn also testified he believed Hughes was not travelling at an unsafe speed and his speed was not a contributing factor to the collision. He also said, based on the point where Hughes began reacting and the evasive measures he took, he did not believe Hughes's reaction time or perception had been significantly impaired.

If the prosecution had rested after this testimony, it is unlikely in the extreme the jury would have found beyond a reasonable doubt that Hughes's intoxication was a

substantial factor in causing the accident and the victims' deaths. The prosecutor knew this. He said as much in closing arguments to the jury. "Now, this case actually comes down very simply to one question and one question only: The expert testimony was that a person driving 55 miles an hour and going – and not being intoxicated would have missed this collision, and there's no evidence to the contrary."

We think the trial court abused its discretion by failing to declare a mistrial. Allowing Sergeant Berns's testimony on causation without giving the defense an adequate opportunity to prepare to cross-examine him undermined the fundamental fairness of the trial. Defense counsel's attempts to attack his new opinions, without adequate preparation time and time to consult with their own experts, make the problems obvious. They did an excellent job questioning Berns on procedural issues. Wasn't he departing from his colleagues on the MAIT team? Yes. Wasn't he failing to follow MAIT standards by providing his own opinion without consulting with his MAIT team members? Yes. But without adequate time to explore and analyze Berns's new calculations with the assistance of trained experts, they were not able to attack the merits of his conclusions. As a result, as the prosecutor made sure to point out in closing arguments, Berns's testimony that the accident wouldn't have happened if Hughes had been driving sober and at the speed limit was uncontradicted.

Though the trial court had discretion to consider lesser remedies, the remedies it chose were simply inadequate. First, directing the jury that the prosecution didn't disclose Berns's testimony in a timely fashion did nothing to enable Hughes's defense team to test

41

the merits of his new testimony. Nor did allowing them to recall Berns for further questioning. What they needed to address the merits was additional information about Berns's new opinions and their basis, time to seek out and engage new experts, and the time to work with new experts to produce a fact-based response to what turned out to be damning testimony. The trial court could have saved the trial by ordering that admittedly drastic remedy when defense counsel objected to Berns's new opinions at trial. However, when the court instead allowed the prosecutor to present the new evidence, the situation changed, and the only effective remedy at that point was to declare a mistrial and allow Hughes to face trial again, prepared to respond to Sergeant Berns's testimony on the merits. That is the remedy we order now.

## III

## DISPOSITION

We reverse the convictions.

CERTIFIED FOR PUBLICATION

SLOUGH _____
J.

We concur:

RAMIREZ _____
P. J.

MENETREZ _____
J.